# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| SHARONE HUBERT,<br>        Plaintiff,<br><br>        v.<br><br>STATE OF CONNECTICUT<br>DEPARTMENT OF CORRECTION, *et al.*,<br>        Defendants. | No. 3:14-cv-476 (VAB) |

## RULING AND ORDER ON PENDING MOTIONS

Sharone Hubert ("Plaintiff") has sued the State of Connecticut Department of Correction ("Defendant" or "DOC") and various individual DOC employees. *See generally* Am. Compl., ECF No. 10. Specifically, she has sued Captain Kyle Godding ("Godding"), Deputy Warden Michael Davis ("Davis"), Correction Officer Kevin Curry ("Curry"), Lieutenant Derrick Austin ("Austin"), and Lieutenant Cicero Callender ("Callender") (collectively, the "Individual Defendants"), each in his official capacity (collectively "Defendants"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. §§ 1985, 1986, and 1988.

Defendants now move for summary judgment. ECF No. 121. Defendants also move to dismiss this action under Federal Rules of Civil Procedure 37(b) or 41(b). ECF No. 126. Ms. Hubert has moved for reconsideration. ECF No. 134. Ms. Hubert has also moved to consolidate. ECF No. 141.

For the following reasons, the motion for summary judgment is **GRANTED**. The motion to dismiss is **DENIED** as moot, the motion for reconsideration is **DENIED** as moot, and the motion for consolidation is **DENIED** as moot.

# I. FACTUAL AND PROCEDURAL BACKGROUND[1]

## A. FACTUAL ALLEGATIONS

Ms. Hubert, an African American woman, has been employed by the DOC since February 1998. Am. Compl. ¶ 4. The DOC is a cabinet-level, para-military, state agency responsible for confining and supervising accused and sentenced criminal defendants in correctional institutions, centers, and units, and it administers medical, mental health, rehabilitative, and community-based service programs across the state. *Id.* ¶ 12; Miller Aff. ¶ 4, Defs.' SMF, Ex. 5, ECF No. 121-8. The DOC employs more than five hundred officers and civilian employees state-wide, and it has confirmed compliance with federal and state anti-discrimination laws and regulations. Am. Compl. ¶ 13.

### 1. Hartford Correctional Center

From February 13, 1998, through September 10, 2009, Ms. Hubert was assigned to the Hartford Correctional Center ("Hartford CC"). Defs.' SMF ¶ 3; Hubert Aff. ¶ 6, Pl.'s SMF, Ex. 17, ECF No. 130-34. During this time, Michael Davis was the Captain at Hartford CC. Defs.' SMF ¶ 32.

While stationed at Hartford CI, Ms. Hubert worked with Lieutenant Derek Austin. Hubert Dep. at 19:1–12. Ms. Hubert testified that, beginning in 1999, Mr. Austin would come to her post and expose himself to Ms. Hubert and make lewd comments to Ms. Hubert in front of other officers. *Id.* at 66:1–8. Mr. Austin was, according to Ms. Hubert, told to stay away from Ms. Hubert, and eventually transferred to a different DOC facility on November 29, 2001. *Id.* at 65:24–25, 55:9–14. The last contact Ms. Hubert had with Mr. Austin was in 2002. *Id.* at 19:11–14.

---

[1] The facts are undisputed unless otherwise noted.

Ms. Hubert testified that she filed reports about Mr. Austin and, according to Ms. Hubert, these reports went unanswered. *Id.* at 63:14–21. She explained that the DOC's Affirmative Action Unit was a "joke." *Id.* at 63:15.

It was also at Hartford CC where Ms. Hubert worked with Officer Kyle Godding. Hubert Dep. at 305:13–17. Ms. Hubert testified that Mr. Godding would come to Ms. Hubert's post in main control and asked if Ms. Hubert would give Mr. Godding a pair of her underwear to smell and told her she was beautiful and that he had a crush on her. Hubert Aff. ¶ 61. At one point, Mr. Godding allegedly stated that he knew Ms. Hubert was being considered for a promotion and said he would put in a good word for Ms. Hubert and then asked for a hug and a kiss. *Id.*

After 2005, Ms. Hubert no longer worked with Mr. Godding, but they stayed in touch with one another. Hubert Dep. at 305:15–20.

### a. Administrative Directive 2.2, Sexual Harassment, Effective September 15, 2008

On September 15, 2008, the DOC issued Administrative Directive 2.2.[2] *See generally* Sept. 15, 2008, Miller Aff., Ex. C, ECF No. 121-11 (superseding Administrative Directive 2.2, dated May 1, 2007).

---

[2] In relevant part, the Directive provides:

> 9. <u>Filing a Complaint</u>. The Department shall investigate and remedy sexual harassment, retaliation and related misconduct that come to its attention whether or not the employee has made a complaint. The following procedures apply to complaints:
> B. Complaints may be made in the following ways:
> > 1. On CN 2101, Affirmative Action Complaint Form. . . .
> > 2. By any other written complaint, letter or report;
> > 3. By telephone;
> > 4. In person; or,

### b. The Gym Room Incident

In spring 2009, Mr. Davis, Ms. Hubert's supervisor, allegedly asked her to leave her post and accompany him to "the gym room." Hubert Dep. at 44:9–17. Mr. Davis allegedly told Ms. Hubert that there was missing equipment, and he needed her assistance in finding it. *Id.* at 44:23–25. Ms. Hubert testified that she was looking for the missing equipment when Mr. Davis tried to kiss her. *Id.* at 45:6–8. With her back against a wall, Mr. Davis allegedly put his hand inside Ms. Hubert's underwear and asked if he could put the tip of his penis inside her. *Id.* at 45:10–46:9. Mr. Davis allegedly unzipped his pants and asked Ms. Hubert to perform a sexual act for him. *Id.* at 46:11–16. At this point, someone walked by, and Ms. Hubert tried to walk away, but Mr. Davis allegedly restrained her. *Id.* at 46:21–22.

Other than to her husband, Ms. Hubert did not report the incident, Defs.' SMF ¶ 33, because she feared retribution. Hubert Aff. at ¶ 35. Also, Mr. Davis's wife worked in the

---

<div style="margin-left:2em">

5. By filing a complaint with the Equal Employment Opportunity (EEOC) or the Connecticut Commission on Human Rights and Opportunities (CHRO) . . . .

C. A complaint of violation of this Directive may be made directly to any of the following in any of the ways listed in Section 9(B) of this Directive:
   1. Affirmative Action Unit;
   2. Human Resources;
   3. Unit Administrator or Director;
   4. Any manager or supervisor;
   5. The independent consultant appointed by the Permanent Commission on the Status of Women (PCSQ); or,
   6. The Permanent Commission on the Status of Women.

</div>

*Id.* at 4–6.

Affirmative Action Office "and would have been privy to the substance of [Ms. Hubert's] complaint." *Id.*

Mr. Davis was transferred to Cheshire CI. Hubert Dep. at 50:16–17.

### c. Administrative Directive 2.17, Employee Conduct, Effective January 31, 2009

Administrative Directive 2.1, Employee Conduct, became effective on January 31, 2009.[3]

*See generally* Jan. 31, 2009, Admin. Directive 2.1, Miller Aff., Ex. A., ECF No. 121-9.

---

[3] The Directive Provides, in pertinent part:

> B. Act in a professional manner showing respect to other employees and the public.
>> 8. Abuse sick time, accrued leave or workers' compensation.
>> 17. Engaging in behavior that is sexually, emotionally, or physically abusive or harassing toward the public, employees or inmates.
>> 18. Unauthorized appropriation or use of any property belonging to the public, state or an inmate for personal, political or union purposes (i.e., computers, electronic mail, Department letterhead, etc.).
>> 25. Failure to follow a lawful order.
>> 26. Engaging in insubordination.
>> 27. Failure to cooperate with a Department investigation.
>> 28. Lying or giving false testimony during the course of a Department investigation.
>> 29. Intentionally withholding information necessary for the completion of an investigation.
>> 9. Reporting Policy and/or Conduct Violation. Each employee shall report to a supervisor or appropriate personnel any policy violation or breach of professional conduct involving the public, employees or inmates.

*Id.* at 1–3, 5–6.

### 2. York Correctional Institute

From September 11, 2009, through December 8, 2009, Ms. Hubert was assigned to York Correctional Institute ("York CI"), Defs.' SMF ¶ 3, and promoted to Correctional Lieutenant. Hubert Aff. ¶ 62.

### 3. Gates Correctional Institute

From December 9, 2009, through January 28, 2010, Ms. Hubert was assigned to Gates Correctional Institute ("Gates CI"). Defs.' SMF ¶ 3. Though Mr. Godding was not stationed at Gates CI, Mr. Godding would call Ms. Hubert from his facility and send her emails. Hubert Aff. ¶ 63.

#### a. December 29, 2009 Letter to Hamden Police Department

Officer Rosalyn Williams accused Ms. Hubert of placing a woman who was allegedly having an affair with Ms. Hubert's husband in the trunk of Ms. Hubert's car and holding the woman hostage. Defs.' SMF ¶¶ 29–30.

On December 29, 2009, the police came to Ms. Hubert's home, searched her vehicle, and found no body in the trunk of the car. CHRO Compl. ¶ 16. That day, Ms. Hubert wrote a letter to the Hamden Police Department on DOC letterhead. Dec. 29, 2009, Hamden Ltr. at 1, Hubert Dep., Ex. 16, ECF No. 121-4 at 154. In the letter, Ms. Hubert stated that, earlier that day, a police officer from the Hamden Police Department arrived at Ms. Hubert's home and asked Ms. Hubert questions about Ms. Williams. *Id.* Ms. Hubert explained that Ms. Williams had a child with Ms. Hubert's husband before Ms. Hubert married him. *Id.* According to Ms. Hubert, Ms. Williams had called the police and reported that Ms. Hubert threatened Ms. Williams at Ms. Williams's house. *Id.* Ms. Hubert stated that Ms. Williams had threatened Ms. Hubert's family and made false reports due to Ms. Williams's infatuation with Ms. Hubert's husband. *Id.* at 2.

### b.      January 27, 2010 Letter from Warden Kevin Gause

Ms. Hubert testified that, upon the recommendation of Ms. McLaurin, on January 27, 2010, Warden Kevin Gause issued to Ms. Hubert a letter informing Ms. Hubert that she failed a promotional working test period and was "demoted" to correctional officer. July 16, 2010, CHRO Compl. ¶ 13. Ms. McLaurin, Ms. Hubert alleges, falsely accused of Ms. Hubert of failing to comply with a direct order on November 30, 2009, and subsequently Ms. Hubert received an unsatisfactory rating. *Id.* ¶ 13.

Mr. Gause's letter stated: "This letter is to inform you that you failed your promotional working test period in the position of Correctional Lieutenant and you will be reverted to your former classification of Correction Officer." Jan. 27, 2010, Gause Ltr. at 1, Hubert Dep., Ex. 32, ECF No. 121-4 at 163. Mr. Gause notes that, during the rating period, Ms. Hubert refused to fully comply with a direct order in violation of Directive 2.17, resulting in an unsatisfactory rating. *Id.* Ms. Hubert refused to sign the letter. *Id.*

Jeffrey Miller, the DOC Director of Human Resources, testified that, under the collective bargaining contract between the state of Connecticut and the Connecticut State Employees Association, SEIU Local 2001—which represents correctional supervisors including lieutenants—Ms. Hubert was subject to a six-month working test period. Miller Aff. ¶ 9. Mr. Miller further testified that an internal investigation substantiated that, on November 30, 2009, Ms. Hubert failed to fully comply with a direct order from her supervisor. *Id.* ¶ 11. Having failed the promotion working test, Ms. Hubert "reverted" to her former position of correction officer, effective January 29, 2010. *Id.* ¶¶ 10, 14.

### 4. Hartford Correctional Center

From January 29, 2010, through December 1, 2010, Ms. Hubert was assigned to Hartford CC, Miller Aff. ¶ 6, but during this time, Ms. Hubert was out of work due to a work-related injury. Hubert Aff. ¶ 6.

### a. Administrative Directive 2.7, Employee Conduct, Effective April 15, 2010

On April 15, 2010, the DOC promulgated a revised Administrative Directive 2.1, Employee Conduct. *See generally* Apr. 15, 2010, Admin. Directive 2.1, Miller Aff., Ex. B, ECF No. 121-9. All relevant provisions are identical to the January 31, 2009, Administrative Directive 21. Additionally the Directive prohibits possessing "any personal electronic wireless communication device (to include, but not limited to, a cellphone, pager, blackberry device, [or] personal digital assistant (PDA))." *Id.* § 5(B)(34)(a).

### b. July 16, 2010 Commission on Human Rights and Opportunities Complaint

On July 16, 2010, Ms. Hubert submitted a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). *See generally* July 16, 2010, CHRO Complaint (No. 111014), Defs.' SMF, Ex. 2, ECF No. 121-5. In it, Ms. Hubert alleged that, on September 11, 2009, Warden Kevin Gause promoted her to Correctional Lieutenant. *Id.* ¶ 4. The promotion increased her salary by $25,000. *Id.* Upon promotion, Captain Sharon McLaurin became Ms. Hubert's immediate supervisor. *Id.* Referring to an affirmative action complaint she filed on December 10, 2009, Ms. Hubert stated:

> In my [December 10, 2009] complaint, . . . I allege, in part, that Captain McLaurin "disrespected me as a female and professional", relating to me as being "Ghetto," deny me the opportunity for advancement by not allowing me to "learn the desk duties" and not giving me the recommendation letter I ask for. I also alleged in my complaint that I was "placed in a hostile work environment" with

staff by Captain McLaurin telling my peers (i.e. Lieutenant Wayne Crews, Lieutenant Craig Burnett, Lieutenant Terrance O'Hanion, and Lieutenant Mr. Begun) negative things about me "causing them to dissociate themselves from me." I also say in my complaint that I was told by Captain McLaurin that "if I don't leave York CI (Correctional Institute) I would be a Lieutenant for the rest of my career."

*Id.* ¶ 7. Ms. Hubert asserted that she had been subject to harassment and unequal treatment based on her sex. *Id.* ¶ 8. The Affirmative Action Unit determined that Ms. Hubert's December 10, 2009, complaint was unsubstantiated. *Id.* ¶ 9.

In the CHRO complaint, Ms. Hubert stated that, after Ms. Hubert filed the complaint with the Affirmative Action Unit, Ms. McLaurin's harassment increased. *Id.* ¶ 10. Specifically, Ms. Hubert alleged that Ms. McLaurin issued a poor evaluation in December 2009, recommended Ms. Hubert be transferred to another facility,[4] and falsely accused Ms. Hubert of doctoring an obituary to get time off for a funeral, *id.*; *see also* Request for Funeral Leave at 1, Hubert Dep., Ex. 33, ECF No. 121-4 at 163 (showing that Ms. Hubert's request does not include a supervisor's signature and whether the request had been approved or denied); Nov. 30, 2009, Attendance Warning at 1, Hubert Dep., Ex. 21, ECF No. 121-4 at 162 (stating that Ms. Hubert's had insufficient accrued sick leave and/or sick family leave and noting that Ms. Hubert refused to sign the warning and that a second attendance warning would result in docked pay and a written reprimand), and that Ms. McLaurin continued to deny Ms. Hubert desk training or coaching, July 16, 2010, CHRO Complaint (No. 111014) ¶¶ 10–11. Ms. McLaurin gave Ms. Hubert a direct order to sign the warning, and Ms. Hubert refused. Nov. 30, 2009, Attendance Warning at 1.

---

[4] Mr. Miller testified a transfer from one facility to another or one post to another would not significantly change the officer's duties. Miller Aff. ¶ 32; *see also* DAS Class Specification, Def.'s SMF, Ex. 6, ECF No. 121-12 (setting out the job qualifications for and duties of a correction officer, making no distinction between facility or post).

On September 2, 2010, the U.S. Equal Employment Opportunity Commission ("EEOC") issued a notice indicating receipt of Ms. Hubert's CHRO complaint (No. 1110014) for dual filing purposes (EEOC Charge No. 16A-2010-01267). Defs.' SMF ¶ 5. The charge stated that the EEOC "may suspend its investigation and await issuance of the Agency's final finding and orders." EEOC Charge No. 16A-2010-01267 at 1, Defs.' SMF, Ex 3, ECF No.121-6. The charge also advised that complainants are "encouraged to cooperate fully with the Agency." *Id.*

On August 28, 2013, the CHRO issued a finding of no cause. Aug. 28, 2013, CHRO No. 111014, Cause Finding, ECF No. 43-1. The findings pertained solely to the fact that Ms. Hubert failed her promotional test period, causing her to revert back to an officer from lieutenant. *Id.* at 3. On January 10, 2014, the EEOC adopted the CHRO findings. Defs.' SMF ¶ 7.

### 5. Cheshire Correctional Institute

From December 5, 2010, through the time of this filing, Ms. Hubert has been assigned to Cheshire Correctional Institute ("Cheshire CI"). Hubert Aff. ¶ 6. Ms. Hubert maintains: "It was my belief that by the time I got to Cheshire CI, I was already ready to be black balled." Hubert Dep. at 38:1–2. Ms. Hubert believed that, at Cheshire CI, "everyone knew everything about [her]." *Id.* at 38:14–15. According to Ms. Hubert, her CHRO complaint was the topic of rumors at Cheshire CI. *Id.* at 38:18–19. Ms. Hubert could not specifically recall, but believes it was Lieutenant Carolyn Hickman that informed Ms. Hubert that supervisors had been talking about Ms. Hubert. *Id.* at 38:22–25. Ms. Hickman, Ms. Hubert testified, told Ms. Hubert that everyone at Cheshire CI hated Ms. Hubert and that Ms. Hubert "should transfer out." *Id.* at 39:4–5.

### a. Text Messages from Mr. Callender

Beginning in 2010, while touring the facility, Lieutenant Callender allegedly would request hugs from Ms. Hubert. Hubert Dep. at 10:16–18. He allegedly asked her for hugs on

four-to-five separate occasions. *Id.* at 10:22. In 2010, Ms. Hubert allegedly verbally reported this conduct to Ms. Hickman, but does not recall Ms. Hickman's response. *Id.* at 11:16–12:1. Ms. Hubert again reported Mr. Callender's conduct to Ms. Hickman in 2011 or 2012, but Ms. Hickman did not take the report seriously. *Id.* at 12:4–9.

When Mr. Davis transferred to Cheshire CI, Ms. Hubert reported Mr. Callender to Mr. Davis. *Id.* at 11:1. It was her impression that Mr. Davis did not take the report seriously. *Id.* at 12:12–19.[5] Ms. Hubert testified at her deposition: "There was nothing preventing [her] from going to Affirmative Action. [Officers] have choices, whether [officers] to go Affirmative Action, whether [officers] get a lawyer, whether [officers] file it with CHRO. [Officers] don't have to directly go to Affirmative Action." *Id.* at 76:22–77:1; *see also* Sept. 15, 2008, Directive 2.2 § 9(B)(5) (permitting that a complaint may be made by filing a complaint with the EEOC or CHRO). She further explained: "Sometimes you just have to suck it up and say, you know what I gotta get this. No one's gonna help me, so I gotta—whether I'm acting like it didn't happen with [Mr. Davis]. I gotta basically hold my faith and stay strong for my family, because if I break down, then I can't work and I can't feed my kids; I can't pay my son's tuition." Hubert Dep. at 81:11–17. She told Mr. Davis about Mr. Callender because Mr. Davis was her supervisor and because she felt other people to whom she had reported Mr. Callender failed to act. *Id.* at 83:3–84:22.

Because Ms. Hubert allegedly feared retaliation, she never reported Mr. Callender to the Affirmative Action Unit. 13:4–7. She also explained: "[E]very report that goes to Affirmative Action always come[s] back unsubstantiated." *Id.* at 13:12–13.

---

[5] Mr. Hubert testified that Mr. Davis has been calling her ever since she left Hartford CI. Hubert Dep. at 80:20–25.

In 2011, Mr. Callender allegedly sent Ms. Hubert a text message calling her sexy, and asking when she was "going to make it happen," to which she did not respond. Hubert Dep. at 69:8–15. Ms. Hubert allegedly received other similar text messages from Mr. Callender. *Id.* at 69:24. Ms. Hubert shared the texts with her sister and perhaps Ms. Hickman. *Id.* at 70:7–8.

Ms. Hubert testified in her deposition that she complained about Mr. Callender's "inappropriate harassment" to Director James Dzurenda by writing him a letter. *Id.* at 75:22–25, 77:12.

After Ms. Hubert complained, Mr. Callender allegedly began to treat her differently than before. *Id.* 69:15–16.

### b.    The April 29, 2011 Letter

On April 29, 2011, the DOC sent Ms. Hubert a letter. Apr. 29, 2011 Ltr. at 1, Hubert Dep., Ex. 17, ECF No. 121-4 at 156. The letter informed Ms. Hubert that DOC was suspending Ms. Hubert for one day for violating Administrative Directive 2.17 (Employee Conduct) and 6.6 (reporting of incidents). *Id.* A DOC investigation substantiated that, on December 29, 2009, Ms. Hubert had misused state property—a computer, DOC Stationary, and her DOC position—for personal gain. *Id.* The letter also stated: "[T]he investigation substantiated that you failed to report that a co-worker was harassing and threatening you when off duty." *Id.*

On January 12, 2012, by written agreement, the DOC reduced the suspension to a written violation. *See generally* Stipulated Agreement, Hubert. Dep, Ex. 18, ECF No. 121-4 at 157.

### c.       October 31, 2011 Incident

On October 31, 2011, Ms. Hubert testified that she was drafted for first shift, when she

had previously advised her supervisor that she had two medical appointments later that day. Apr.

23, 2012, CHRO Compl. ¶¶ 11–14. Ms. Hubert has a medical condition that causes exceedingly

heavy menstruation. Hubert Dep. at 31:18–20. Having no choice, Ms. Hubert informed a

supervisor, then Lieutenant Brett Mollin, that she had to attend a medical appointment. Apr. 23,

2012, CHRO Compl. ¶ 16. By that time, menses had "drenched" her uniform pants, causing her

embarrassment and humiliation. *Id.* Finally, Mr. Mollin released Ms. Hubert and completed an

incident report. Oct. 31, 2011, Incident Report at 1, Hubert Dep., Ex. 3, ECF No. 121-4 at 110.

As a condition of going home sick, Mr. Mullins required Ms. Hubert to complete an incident

report. *Id.*

In the Incident Report 2011-10-071, Mr. Mollin stated that, while posted as the Desk

Lieutenant, Ms. Hubert was ordered for First Shift. *Id.* Officer Hubert claimed to have a

Worker's Comp. appointment at 10:00 a.m. and requested to be relieved. *Id.* Mr. Mollin

consulted Ms. Hubert's paperwork, in which there was a note that her doctor's appointment

scheduled for October 28, 2011, had been rescheduled for November 1, 2011. *Id.* Soon

thereafter, Mr. Mollin received a facsimile from Yale Medical Group stating that Ms. Hubert had

an appointment scheduled for later that day. *Id.* Mr. Mollin noted the letter did not include a time

for the appointment. *Id.*; *see* October 31, 2012, Fax at 1, Hubert Dep., Ex. 3, ECF No. 121-4 at

116 (noting Ms. Hubert's October 31, 2011, appointment but not indicating the time).

Mr. Mollin informed Captain Thomas Veno of the situation, and, while doing so, Ms.

Hubert called Mr. Mollin to say she was going home sick. Oct. 31, 2011 Incident Report at 1.

Mr. Mollin, the report notes, requested an incident report and asked if Ms. Hubert needed a ride

home, which she declined. *Id.* Ms. Hubert informed Mr. Mollin that she had blood on her pants but did not need a new pair of paints. *Id.* at 3. According to Mr. Mollin, Ms. Hubert never informed him that she was experiencing heavy bleeding. *Id.* Mr. Mollin further noted that Ms. Hubert was the fifth out of fifteen officers who had been held over. Mollin Aff. ¶ 4. He further explained that he did not ask Ms. Hubert to prepare an incident report because she had engaged in protected activity. *Id.* ¶ 4. He asked Ms. Hubert to prepare an incident report after Ms. Hubert indicated that she was going home sick. *Id.*

For her part, Ms. Hubert completed a medical incident report later that day. Oct. 31, 2011, Medical Incident Report at 1, Hubert Dep., Ex. 3, ECF No. 121-4 at 113. In it, she noted that she was experiencing "abdominal cramping, bleeding, has MD note for F/U appt with GYN." *Id.* She also completed a supplemental incident report. Oct. 31, 2011, Supp. Report, Hubert Dep., Ex. 3, ECF 121-4 at 124. She explained that someone had informed her that another female who reported she was sick was allowed to go home without issue. *Id.* at 4.

Ms. Hubert has offered a memorandum dated July 14, 2008, regarding "Sick Leave Regulations and Proper Protocol." July 14, 2008, Memo at 1, Pl.'s SMF, Ex. 16, ECF No. 16, ECF No. 130-24. The memorandum provides: "Regarding medical appointments, *Sec. 5-247-4(a)(1)* states that an eligible employee shall be granted sick leave for '*medical, dental or eye examination or treatment for which arrangements cannot be made outside of working hours*.'" *Id.* The memorandum also provides that verification of medical appointments are required when a more than a half workday is used for such purposes. *Id.*

Ms. Hubert is unsure whether Mr. Mollin knew of Ms. Hubert's earlier CHRO case, but she knew that other supervisors knew of it. Hubert Aff. ¶ 26. Ms. Hubert believes she had suffered "[r]etaliation because of who [she is] and just retaliation." Hubert Dep. at 31:8–10.

That day, October 31, 2011, Ms. Hubert sent Warden Jon Brighthaupt a letter about the incident. Defs.' SMF ¶ 27; *see generally* Oct. 31, 2011, Brighthaupt Ltr., Hubert Dep., Ex. 3, ECF No. 121-4 at 120. In the letter, Ms. Hubert recounted the incident from earlier that day, ant noted that she felt humiliated, embarrassed, and harassed due to her race and gender. Oct. 31, 2011, Brighthaupt Ltr. at 2. She alleges that, instead of allowing Ms. Hubert to attend to a medical emergency, Mr. Mollin fabricated a reason not to release her. *Id.* Ms. Hubert also asserts that she would have had twenty-four hours to complete the incident report; instead, Mr. Mollin made her complete the report while covered in blood in front of male workers. *Id.* Ms. Hubert also felt she was being retaliated against. *Id.* at 3.

On January 10, 2012, Mr. Brighthaupt forwarded a letter to DOC's Affirmative Action Unit to determine if the incident involved sexual harassment, retaliation, or violated other DOC regulations. *Id.* ¶ 28.

### d. The December 23, 2011 Incident

On December 23, 2011, Ms. Hubert was placed on paid administrative leave because of the December 29, 2009, incident involving Ms. Williams. Am. Compl. ¶ 29. Before returning to work, Ms. Hubert was required to undergo a "Fit for Duty Exam," *id.* ¶ 31, after which she was cleared to work. Hubert Dep. at 125:16.

### e. Leave

Between December 27, 2011, and March 23, 2012, Ms. Hubert was continuously out of work on various leave statuses. Lester Aff. ¶ 5, Defs.' SMF, Ex. 7, ECF No. 121-14.

### f. April 23, 2012 Commission on Human Rights and Opportunities Complaint

On April 23, 2012, Ms. Hubert filed a complaint with the CHRO (No. 1110014), alleging retaliation since filing an August 2010 CHRO complaint.[6] Apr. 23, 2012, CHRO Compl. ¶ 11. ECF No. 43-1 at 25. In it, she recounted the October 31, 2011, incident. *Id.* ¶¶ 11–21. Ms. Hubert raised her denial of medical attention and not being allowed to seek medical treatment. *Id.* ¶ 22. Ms. Hubert explained: "Lieutenant Mollins [*sic*] purposely humiliated, embarrassed and harassed me, and subject[ed] me to a work environment that would be considered hostile to any female employee. I believe that Lt. Mullins [*sic*] was retaliating against me because I filed a CHRO complainant [*sic*]." *Id.* ¶ 16.

She also described the December 23, 2011 incident in further detail. *Id.* ¶ 33. Specifically, Ms. Hubert alleged that various other officers, all white men who had committed violations—*e.g.*, engagement in a physical altercation with another office or being arrested for violating a protective order—were not placed on Administrative Leave. *Id.*

She also described difficulties receiving workers' compensation payment for work-related injuries. *Id.* ¶¶ 43–47.

### g.    Leave

Between April 2012 and January 2013, Ms. Hubert was out of work on various leave statuses, working only March 23–27, 2012. Defs.' SMF ¶ 89; Lester Aff. ¶¶ 6–7.

### h.    June 11, 2012 Amendment of the April 23, 2012 CHRO Complaint

On June 11, 2012, Ms. Hubert amended the April 23, 2012 CHRO complaint. *See generally* June 11, 2012, CHRO Amend't. ECF No. 43-1 at 12. While incorporating allegations

---

[6] Again, the EEOC indicated that it would suspend its investigation and await the CHRO's determination (EEOC No. 16a-2012-0091). Def.'s SMF ¶ 13.

from the April 23, 2012, CHRO complaint, Ms. Hubert outlined further difficulties with her workers' compensation claim and FMLA leave. *Id.* ¶¶ 8–25, 28–29.

Ms. Hubert also recounted the May 17, 2012 incident, where Captain Bryan Viger allegedly called Ms. Hubert at home to inform her that she was to attend a Loudermill hearing for an employee conduct violation. *Id.* ¶ 26. She explained:

> This hearing [was] based on the false allegation[] that I reported via text message that "I was in a new place no signal I'm need you to bond me out of jail." I reported that the text was on my son's phone and that the text was not truthful. Allegations that I was hindering an investigation because I didn't have the text message in my phone when the police came to my home are misleading and false. At the time of the incident I was off duty, at home, minding my own business. . . . This case was being investigated by Captain Kelly from security division.

*Id.*

According to Ms. Hubert, on May 18, 2017, the Deputy Commissioner's secretary called to inform Ms. Hubert that her meeting with the Deputy Commissioner has been canceled because of Ms. Hubert's pending CHRO complaint. *Id.* ¶ 27.

### i. Kyle Godding's August 16, 2012 Text Message

Ms. Hubert testified that she was friends with Mr. Godding until he sent Ms. Hubert photographs of his penis. Hubert Aff. ¶¶ 67–68. Other than telling her husband, Ms. Hubert allegedly did not report the text message to anyone at DOC because, at the time, she was on leave. Hubert Aff. ¶ 71. Ms. Hubert testified that, consistent with DOC Administrative Directive ("Directive"), she "reached out to" the Permanent Commission on the Status of Women, Directive 2.2 § 9(C)(5), Ex. C, ECF No. 121-11 ("The independent consultant appointed by the Permanent Commission on the Status of Women (PCSW) . . . ."),  and to her therapist, pastor,

friends, and family. Hubert Aff. ¶ 71. Although Ms. Hubert had asked Mr. Godding to stop

calling Ms. Hubert, he continued to e-mail her asking to her meet with him. *Id.* at ¶ 72.

### j. Michael Davis's Text Message

Mr. Davis also sent Ms. Hubert sexually explicit text messages from his personal mobile

telephone. Defs.' SMF ¶ 123. Ms. Hubert testified that Mr. Davis took a photograph of his penis

and sent it to Ms. Hubert. Hubert Dep. at 314:3–7. Ms. Hubert believes it was Mr. Davis that sent

the photograph because he called her from his on cellphone after he sent the photograph. *Id.*

314:10–11.

### k. Kevin Curry's Text

Mr. Hubert testified that, shortly after speaking with Mr. Davis, Mr. Curry, by text

message, sent Ms. Hubert a photograph of Mr. Curry's penis. *Id.* at 314:24–25. She then called

Mr. Curry on the telephone, and Mr. Curry apologized *Id.* at 314:25–315:6.

### l. The January 30, 2013 Letter

Ms. Hubert first notified someone about the sending of sexually explicit photographs on

January 30, 2013, when she returned to work from leave, Hubert Aff. ¶ 71, in advance of a pre-

disciplinary hearing. Jan. 30, 2013, Hubert Ltr. at 1, Hubert Dep., Ex. 7, ECF No. 121-4. The

disciplinary hearing involved the situation between Ms. Hubert and Ms. Williams and resulted in

Ms. Hubert being placed on administrative leave. *Id.* at 120:19–25. In the letter, Ms. Hubert

accused Ms. Williams of trying to break up Ms. Hubert's marriage. Hubert Ltr. at 1. Ms. Hubert

alleged that Ms. Williams falsified an incident report about Ms. Hubert, from which the pre-

disciplinary hearing arose. *Id.* at 4.

In the letter Ms. Hubert sent before the hearing, she stated: "Captain Kelly never gave me

a direct order to give him my phone, I told him there was [*sic*] inappropriate text messages," but

did send to Mr. Kelly a copy of the text message exchanged between Ms. Williams and Ms.

Hubert. Hubert Ltr. at 4–5. The letter continued:

> If the Department is going to hand out discipline for a lie[,] then every supervisor from <u>Wardens</u> to <u>Captains</u> and <u>Officers</u> that have sent pictures to my cell phone of their penis[es] should be discipline[d] as well, this is a violation of 2:17 employee conduct, it was not wanted. . . . I will hand over the pictures of supervisors['] penis and text messages to my lawyer after I'm disciplined for the lie that was told.

*Id.* at 5–6. Mr. Kelly attempted to interview Ms. Hubert about Mr. Davis, Mr. Curry, and Mr.

Godding allegedly sending Ms. Hubert texts messages of their genitals, but Ms. Hubert declined

to participate; instead, she chose to "plead the fifth." Defs.' SMF ¶ 125. Ms. Hubert testified:

"[T]here was no reason for me to talk to Captain Kelly 'cause he already had interviewed me."

Hubert Dep. at 110:14–16. Ms. Hubert explained that she declined to participate in the Security

Division investigation: "I was tired, and I'm not gonna sit through a hearing of lies." *Id.* at

109:23–24. The DOC disciplined Ms. Hubert because she was "less than truthful" during the

Security Division investigation. *Id.* at 108:3–5. As part of the investigation, Mr. Kelly also

contacted Mr. Davis, who denied sending Ms. Hubert sexually explicit photos.

On June 24, 2013, as a result of the hearing, the DOC suspended Ms. Hubert for one day

of work, stating: "Your failure to adhere to department directives displayed poor judgment on

your part and breached the standard of conduct that is expected of Department of Correction

employees." June 24, 2013, Ltr. at 1, Hubert Dep., Ex. 22, ECF No. 121-4 at 159.

Ms. Hubert testified that she did not grieve or challenge the suspension. Defs.' SMF ¶

101. According to Ms. Hubert, the suspension "didn't mean anything to [her]." Hubert Dep. at

194:14.

### m.      The May 23, 2013 Letter from Affirmative Action

On May 23, 2013, Holly Quackenbush Darin, the Affirmative Action Unit Manager, sent Ms. Hubert a letter. May 23, 2013, Affirmative Action Ltr. at 1, Pl.'s SMF, Ex. 9, ECF No. 130-25. The letter referred to Ms. Hubert's January 30, 2013, letter, specifically Ms. Hubert's allegation that her supervisors had sent text messages to Ms. Hubert that included sexually explicit photographs. *Id.* The letter also noted that Judy Garcia, an investigator assigned to the matter, had attempted to schedule an interview with Ms. Hubert, but Ms. Hubert refused to participate in the interview. *Id.* Ms. Hubert testified: "[T]hat [she] didn't have trust in Affirmative Action." Hubert Dep. at 111:1–2. Ms. Hubert maintains that Ms. Garcia informed Ms. Hubert that her refusal to participate in the investigation warranted reporting Ms. Hubert for discipline. *Id.* at 111:9–11. To which Ms. Hubert responded: "Well, then have warden Brighthaupt discipline me, because at this time I'm pleading the Fifth and I fear for my safety, at the request of my counselor." *Id.* at 12–15.

Ms. Darin's letter advised Ms. Hubert that the investigation would go forward, without taking any additional statements from Ms. Hubert. May 23, 2013, Affirmative Action Ltr. at 1.

### n.     May or June 2013 Performance Evaluation

Sometime in either May or June 2013,[7] Mr. Callender issued Ms. Hubert an NP-4 Performance Appraisal; he provided her with an overall rating of successful. NP-4 Performance Appraisal for Period Sept. 1, 2010–Aug. 31, 2011 at 1 ("Performance Appraisal"), Hubert Dep., Ex. 6, ECF No. 121-4 at 143. Ms. Hubert maintains that it was a "horrible evaluation" after having received four years of excellent evaluations. Hubert Dep. at 71:15–19. On the evaluation, which Ms. Hubert refused to sign, she wrote: "How could Lieutenant Callender give me an

---

[7] The Court notes that the evaluation includes several signatures with various associated dates ranging from May 20, 2013, to July 7, 2013. Performance Appraisal at 2–3.

evaluation and feel comfortable about it after [h]e was [a]lso one of the supervisors sending me (text messages)." Performance Appraisal at 3. She admits that she did not specify the nature of the text messages; nor did she show anyone the text messages. *Id.* 72:12–14. In any event, Ms. Hubert claims that a supervisor texting an officer, while she is at home is inappropriate. *Id.* at 72:12–22. According to Ms. Hubert, as a captain, Mr. Taylor, who signed the evaluation, was supposed to immediately make a complaint with the Affirmative Action Unit on Ms. Hubert's behalf. *Id.* at 70:17–19.

### o. The Closing of Ms. Hubert's Affirmative Action Complaint

On July 24, 2013, the Affirmative Action Unit notified Ms. Hubert that investigation of her complaint (Case #AA13-500) had been completed and the alleged violation of Administrative Directive 2.2 contained in [Ms. Hubert's January 30, 2013, Letter] could not be substantiated "due to [Ms. Hubert's] unwillingness to provide a statement." July 24, 2013, Affirmative Action Ltr. at 1, Hubert Dep., Ex. 10, ECF No. 121-4.

After Ms. Hubert received the letter from the Affirmative Action Unit, she sent the two photographs that had been sent to her. *Id.* at 115:1–6. She maintains that she sent the photographs attached to a letter she sent to the Affirmative Action Unit by certified mail. *Id.* at 116:10–16. The letter was about DOC's denying her promotion and accusing her of being less than truthful. *Id.* at 116:16–117:12.

Ms. Hubert testified that she spoke with Ms. Garcia, but Ms. Hubert could not recall the nature of the visit. *Id.* at 134:1. She claims to have signed a statement about sexual harassment. *Id.* at 134:16–21. Ms. Garcia also asked Ms. Hubert whether Ms. Hubert cared to elaborate on the photographs Ms. Hubert submitted to Ms. Garcia. *Id.* at 135:24–1. Ms. Hubert explained that the photographs were sent to her cellphone and that Ms. Hubert did not want to speak with Ms.

Garcia at the time because Ms. Hubert's attorney had advised Ms. Hubert not to speak about the photographs. *Id.* at 135:1–5. Ms. Hubert showed Ms. Garcia no other photographs, and Ms. Garcia did not ask to see other photographs. *Id.* at 135:8–16.

### p.  The Commissary Housing Incident

One evening when Ms. Hubert was working overtime, Mr. Davis allegedly entered the commissary housing unit, where Ms. Hubert was working a solo post. Hubert Dep. at 50:25–61:17. Ms. Hubert stood from behind her desk, and Mr. Davis allegedly began groping Ms. Hubert, grabbing her buttocks and kissing her neck. *Id.* at 52:1–6. She pushed him away. *Id.* at 52:10. Fearing retaliation, Ms. Hubert did not report the incident. *Id.* at 52:11–16.

Mr. Davis allegedly continually called Ms. Hubert on the telephone. *Id.* at 52:21–22. She does not recall their conversations. *Id.* at 53:14. Ms. Hubert had no contact with Mr. Davis after 2013, although he tried to connect with Ms. Hubert through Facebook in 2016. *Id.* at 53:7–24.

### q.  The May 17, 2014 Incident

On May 17, 2014, Mr. Callender issued Ms. Hubert a late slip for being late to work by three minutes. Defs.' SMF ¶ 43. After arriving at work at 10:30 a.m., Ms. Hubert called in to report she was, in fact, at work. Hubert Dep. at 15:25–16:7. Ms. Hubert then went to the restroom off the lunchroom to change her menstrual pad. Defs.' SMF ¶¶ 45–46. While she was using the restroom, Mr. Callender allegedly sent an officer to bang on the lunchroom restroom door and tell Ms. Hubert to come out of the restroom. Hubert Dep. at 16:10–17. Due to using the restroom, Ms. Hubert was late for roll call. Callender Dep. at 26:13–19, Defs.' SMF, Ex. 6, ECF No. 121-13. In the comment section on the late slip, Ms. Hubert wrote about her condition and explained that she suffered from prolonged bleeding, which required her to frequently change her menstrual pad. Hubert Dep., Ex. 4; *see also* May 5, 2014, 2nd Notice of Tardiness at 1, Pl.'s

SMF, Ex. 12, ECF No. 130-28 (noting: "By the time I arrive at work , my pads are soaked. . . . I had to change my pad. Did not come in for roll call.").

Mr. Callender denies that he sent an officer to the lunchroom restroom. Callender Dept. at 26:10–11. Only after roll call did Ms. Hubert tell Mr. Callender where she had been. Callender Dep. at 26:13–15.

Ms. Hubert recognized that her post was in housing unit control, where there was a restroom, and where she was stationed. *Id.* at 17:4–6. According to Ms. Hubert, she did not feel comfortable using the housing unit restroom with a single male officer on post because an officer at the Hartford Correctional Center had recently been charged as a serial rapist. *Id.* at 17:8–19.

Ms. Hubert contends that, as a result of the late slip, she was denied weapons training. *Id.* at 95:4.

Mr. Viger testified by affidavit that, between 2013 and 2014, four female corrections officers had received weapons training, three of whom were officers assigned to CCI. Viger Aff. ¶¶ 5–6.

### r.      May 23, 2014 Family Medicine Center Letter

In a letter dated May 23, 2014, Mary P. Guerrera, MD, issued a letter addressed to: "To whom it may concern." May 23, 2014, Guerrera Ltr. at 1, Hubert Dep., Ex. 3, ECF No. 121-7 at 136. It stated: "As [Ms. Hubert's] [p]hysician I write this letter to confirm that she has a gyn condition that may cause her to have heavy menstrual / period bleeding that requires her to use the bathroom / restroom to properly change her femminine [*sic*] products up to every three (3) hours as needed." *Id.*

### s.      June 8, 2014 Incident

On June 8, 2014, Ms. Hubert felt that her menstrual pad was saturated. Hubert Dep. at 97:2–3. She called Mr. Callender to ask for coverage while she used the restroom. *Id.* at 97:6–8. Mr. Callender allegedly responded: "You're an inconvenience on the shift," and slammed down the telephone. *Id.* at 97:22–98:2. It was a "few or fifteen minutes" before someone came to relieve Ms. Hubert so she could use the restroom. *Id.* at 98:4–12.[8]

Ms. Hubert maintains that, in 2014, she complained to Deputy Warden Walker. Defs.' SMF ¶ 39. Ms. Hubert allegedly called Ms. Walker and told Ms. Walker about "[e]verything as far as [Mr. Callender], from the bleeding, from what [Mr. Callender was doing], the evaluations . . . what was going on." Hubert Dep. at 87:12–14. Ms. Hubert claims that Ms. Walker responded: "It is my impression that you are—you are not being harassed." *Id.* at 86:21–22. Ms. Hubert also sent letters to Ms. Walker, including one in which Ms. Hubert sought from Ms. Walker an incident report number regarding Ms. Hubert reporting Mr. Callender, because "without an incident report, [the incident] never happened." *Id.* at 88:4–13; *see also* May 27, 2014, Ltr. to Ms. Walker at 1, Hubert Dep. Ex. 3, ECF No. 121-4 at 140 (including a handwritten note stating: "IRs don't get stamped. It has been issued IR# CCI-2014-05-052. Dr note to HR for File. . . . [Dated] 5/28/2014." In the other letters, Ms. Hubert inquired about promotional opportunities. Hubert Dep. at 88:4.

---

[8] Ms. Hubert has offered a memorandum dated June 26, 2003, issued by then-Commissioner Theresa C. Lantz, the subject of which is "Zero Tolerance." June 26, 2003, Lantz Memo., Pl.'s SMF, App., Ex. B, ECF No. 130-34. The memorandum included a provision entitled "Restroom Issue," which states: "Restroom facilities and restroom breaks shall be provided to employees of the Department such that employees shall ordinarily receive restroom relief within 20 minutes from the time of a request for same." *Id.* at ECF No. 130-34 at 27.

Mr. Miller testified that decisions about eligibility for promotion to lieutenant are determined by Human Resources and the Commissioner of the Department of Correction, Miller Aff. ¶ 17, and that deputy wardens, captains, and lieutenants do not make these decisions. *Id.*

Mr. Miller also testified that there were no promotions to lieutenant in 2012, because the lieutenant exam expired in from 2008 expired on September 2011. *Id.* ¶ 18. The DOC did not offer another lieutenant promotional exam until November 2012, and the first hires from this exam list were made in February 2013. *Id.* ¶ 19. The November 2012 promotional exam expired in November 2014. *Id.* ¶ 20. The next lieutenant promotional exam was offered in February 2015. *Id.* ¶ 21.

In 2013, the DOC determined that Ms. Hubert was ineligible for promotion because of her disciplinary record. *Id.* ¶ 22. In 2013, the DOC promoted eight black females to lieutenant, including one at Cheshire CI. *Id.* ¶ 23.

### t. Ms. Hubert's Letter June 8, 2014 Letter to Mr. Brighthaupt

On June 8, 2014, Ms. Hubert sent a letter to Mr. Brighthaupt. In the letter Ms. Hubert stated: "I am the victim of continuous harassment and retaliation." June 8, 2014, Brighthaupt Ltr. at 1, Pl.'s SMF, Ex. 15, ECF No. 130-32. She then described being assigned to third shift in May 2011, receiving a late slip on May 17, 2014, the May 19, 2014, bathroom incident, her May 19, 2014 conversation with Ms. Walker, the June 7, 2014, bathroom incident, and the June 8, 2014, bathroom incident. *Id.* at 1–3.

### B. PROCEDURAL BACKGROUND

In July 2010, Ms. Hubert filed a complaint with the CHRO charging a supervisor with retaliatory discrimination. The EEOC issued a right-to-sue letter in January 2014. In April 2012, Ms. Hubert filed a second complaint with CHRO, which she amended in June 2012, complaining

of two separate incidents, and alleging three separate incidences of retaliation. In February 2014, the CHRO issued a release-of-jurisdiction letter.

In April 2014, Ms. Hubert and Etienne Hubert filed this lawsuit against the DOC and the individual defendants in their official and individual capacities. ECF No. 1. On October 2014, Ms. Hubert amended the Complaint, which is the operative Complaint. ECF No. 10.

On June 11, 2015, Defendants moved to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, 12(b)(2) for lack of personal jurisdiction, 12(b)(5) for insufficient service of process, and 12(b)(6) for failure to state a claim. ECF No. 40.

In response, Ms. Hubert voluntarily withdrew Count Twelve of the Amended Complaint, which alleged a breach of the implied covenant of good faith and fair dealing against Individual Defendants. The remaining twelve counts asserted claims against various Defendants for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(a) ("CFEPA"); 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988; and state common law. Specifically, Counts One and Five asserted violations of Title VII against all Defendants; Counts Three and Four asserted violations of CFEPA against all Defendants; Counts Nine and Ten alleged sexual harassment against Defendants Davis and Callender, respectively; Counts Six and Eight alleged battery against Defendants Davis and Austin, respectively; Count Seven alleged false imprisonment against Defendant Davis; Count Two alleged loss of consortium against all Defendants; Count Eleven alleged both negligent and intentional infliction of emotional distress against all Defendants; and Count Thirteen alleged violations of rights under 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988 against Defendants DOC, Davis, Godding, Austin, and Callender.

The Court dismissed all claims against Mr. Davis, Mr. Godding, Mr. Curry, Mr. Austin, and Mr. Callender in their individual capacities and several of Ms. Hubert's claims. The Court allowed the following counts to proceed: (1) Count One as to the DOC and the Individual Defendants in their official capacities; (2) Count Five as to the DOC and Individual Defendants in their official capacities; (3) Count Nine, to the extent it asserts claims under Title VII, as to Mr. Davis in his official capacity; (4) Count Ten, to the extent it asserts claims under Title VII, as to Mr. Callender in his official capacity; (5) Count Thirteen, to the extent it asserts claims under 42 U.S.C. §§ 1985, 1986, and 1988 as to the DOC and the Individual Defendants Davis, Godding, Austin, and Callender in their official capacities. The Court also dismissed Etienne Hubert's sole claim of loss of consortium and dismissed him from this case.

The parties then engaged in discovery, during which the Court entered the following orders. On June 30, 2016, the Court ordered Ms. Hubert to "produce to Defendants all materials responsive to all outstanding discovery requests identified on today's [] Telephonic Conference by July 15, 2016." ECF No. 88. Because of Ms. Hubert's lack of compliance "with deadlines in this case or to meet her discovery obligations," the Court set "a firm deadline for the production of the outstanding discovery requests: July 15, 2016. Any of the materials not produced by that date may not be used by Plaintiff in the prosecution of this litigation." *Id.* (citations and internal quotation marks omitted) ("[P]reclusion of evidence . . . [is] necessary to achieve the purpose of Rule 37 as a credible deterrent rather than a paper tiger.") (quotation marks omitted).

On September 19, 2016, Defendants sought and the Court denied Defendant's request for a discovery conference. Instead, the Court reiterated the significance of its June 30th Order. *See* ECF No. 99 (noting that sixty days had passed since the deadline for Ms. Hubert to comply in

producing certain documents and ordering that she was precluded from relying on any documents she had failed to produce when opposing dispositive motions) (internal citation omitted).

Three months later, on November 15, 2016, the Court denied Ms. Hubert's *nunc pro tunc* filing and explicitly stated: "[T]he Court will no longer consider any future *nunc pro tunc* or untimely filings by Plaintiff in this case" and that Ms. Hubert must comply with all future deadlines. *Id.* Nov. 11, 2016, Order at 1, ECF No. 109. The Court noted that Ms. Hubert had repeatedly failed to meet deadlines and comply with this Court's orders. *See, e.g.*, ECF No. 47 (noting that Ms. Hubert filed a motion for extension of time, *nunc pro tunc*, to respond to Defendants' motion to dismiss twenty-six days after the deadline passed); ECF No. 50 (noting that Ms. Hubert failed to timely file her response and instead sought a second extension of time, *nunc pro tunc*); ECF No. 55 (noting Ms. Hubert's failure to file her response to Defendants' motion to dismiss and again seeking an extension, *nunc pro tunc*, and then after three extensions of time Ms. Hubert filed her response nine days after the final deadline); ECF No. 66 (denying Ms. Hubert's motion, *nunc pro tunc*, for an extension of time to file a sur-reply to Defendants' motion to dismiss); ECF No. 84 (noting that Ms. Hubert missed the deadline to respond to Defendants' discovery requests and filed, *nunc pro tunc*, for an extension of time to respond); ECF No. 89 (noting that Ms. Hubert must provide all materials responsive to outstanding discovery requests by a date certain); ECF No. 97 (noting Ms. Hubert's failure to abide by a court-imposed deadline for production); ECF no. 106 (noting that sixty days had passed since the deadline the Court had set for document production and precluding Ms. Hubert from relying on any documents that she failed to produce by a date certain).

On April 7, 2017, Defendants moved for summary judgment. ECF No. 121. On April 13, 2017, Defendants also moved to dismiss the complaint under Federal Rules of Civil Procedure

37(b) or 41(b). ECF No. 126. On May 8, 2017, Ms. Hubert opposed Defendants motion to dismiss and moved to reconsider the Court's November 15, 2016, Order, ECF No. 110.

On November 4, 2017, Ms. Hubert moved to consolidate *Hubert v. State of Connecticut Department of Correction*, 3:17-cv-248 (VAB) (D. Conn. Feb. 16, 2017), with this case. ECF No. 141. On December 11, 2017, the Court heard oral argument. ECF No. 143.[9]

## II.    STANDARD OF REVIEW

A motion for summary judgment will be granted if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Id.* at 324. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Id.* at 248. "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (internal quotation marks and citation omitted).

---

[9] The Court notes that, at oral argument, Ms. Hubert's counsel conceded that she has abandoned her claim of race-based discrimination under Title VII. The Court therefore considers the claim waived. *See Paul v. Bank of Am., N.A.*, No. 3:11-cv-0081 (JCH), 2011 WL 5570789, at *2 (D. Conn. Nov. 16, 2011) (When a party "'offer[s] no response' to its opponent's motion to dismiss a claim, that claim is abandoned." (citing *Molinari v. Bloomberg*, 564 F.3d 587, 609 n.15 (2d Cir. 2009)).

Any inferences drawn from the facts must be done in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343 (2d Cir. 2017). An inference of a genuine dispute of material fact, however, cannot be drawn from conclusory allegations or denials. *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

## III. DISCUSSION

### A. Ms. Hubert's Statement of Material Facts

As an initial matter, the Court will address Ms. Hubert's submission in opposition to the DOC's motion for summary judgment. The DOC argues that, due to the deficiencies in Ms. Hubert's Statement of Material Facts, the Court should disregard Ms. Huber's Statement in its entirety. The Court agrees.

The requirements for an opposition to summary judgment are set forth in the District of Connecticut's Local Rule of Civil Procedure 56. The Rule requires that a party opposing summary judgment must file a statement of material facts, "which shall include a reproduction of each numbered paragraph in the moving party's Local Rule 56(a)1 Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the fact." L.R. 56. This statement must also include a separate section entitled "Additional Material Facts" separately setting forth numbered paragraphs any additional facts not previously set forth in responding to the movant's Statement of Material Fact that the party opposing summary judgment contends establish genuine issues of material fact precluding judgment in favor of the moving party. *Id.* Each statement of material fact and each denial must be followed by a "specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." *Id.*

Ms. Hubert's Statement of Material Facts is improper because she has offered not a single admission or denial. *See* D. Conn. L. Civ. R. 56(a)(2) (requiring that the party opposing summary judgment "admit[ ] or deny[ ] the facts and/or object[ ] to the fact as permitted by Federal Rule of Civil Procedure 56(c)"); Fed. R. Civ. P. 56(c)(2) (permitting objections when "material cited to support or dispute a fact cannot be presented in a form that would be admissible evidence"). The complete absence of admissions or denials "frustrate Rule 56(a)'s purpose of clarifying whether a genuine dispute of material fact exists." *Liston-Smith v. CSAA Fire & Cas. Ins. Co.*, No. 3:16-cv-510 (JCH), 2017 WL 6459552, at *1 n.2 (D. Conn. Dec. 15, 2017).

Ms. Hubert's Statement of Material Facts also fails to comply with the requirement that she provide "a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." Local Rule 56(a)(3).

For example, in paragraph thirty-three of her Statement of Material Facts, she states: "When a male officer was throwing up, he was sent home; the Plaintiff was bleeding heavily, and she was made to stand in soiled clothes and I [*sic*] kept at the job." For support, Ms. Hubert cites to twelve pages from her deposition transcript. In paragraph sixty of the Statement, she provides a quotation of two sentences, and, in support of those two sentences, she cites to eleven pages in her deposition transcript. In yet another example, in paragraph forty-nine of her Statement, she offers: "Defendant Davis also sent various pornographic text messages to the Plaintiff depicting people having sex." For this, she cites thirty-two consecutive pages of Mr. Davis's deposition transcript. In those pages, Mr. Davis expressly stated that he did not send the text messages. Davis Dep. at 26:8, Pl.'s SMF, Ex. 2, ECF No. 130-13.

In the absence of meaningful citations to the record, the Court may "deem[ ] certain facts that are supported by the evidence admitted." Local Rule 56(a)(3); *see Vt. Teddy Bear Co., Inc. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (in adjudicating summary judgment, courts "must be satisfied that the citation to evidence in the record supports the assertion"); *Dolan v. Select Portfolio Servicing*, No. 03-cv-3285, 2016 WL 3512196, at *1 n.4 (E.D.N.Y. June 22, 2016) ("Where a party either (i) admits or (ii) denies without citing to admissible evidence facts alleged in the opposing party's Local Rule 56.1 Statement, the Court shall deem such facts undisputed."); *August v. Dep't of Corrections*, 424 F. Supp. 2d 363, 365 n.2 (D. Conn. 2006) (same); *Cashman v. Ricigliano*, No. Civ. 3:02-cv-1423 (MRK), 2004 WL 1920798, at *1 n.2 (D. Conn. Aug. 25, 2004) (deeming facts in a Local Rule 56(a)(1) Statement admitted because the opposing party did not file a Local Rule 56(a)(2) Statement). The Court therefore deems the facts in the DOC's Local Rule 56(a)(1) statement admitted, to the extent that the facts are supported by the record.

Finally, Ms. Hubert's Statement of Material Facts includes hearsay, speculation, legal conclusions, and unsupported facts. *See, e.g.*, Pl.'s SMF ¶ 1 (stating that DOC "selectively enforces its policies"); *id.* ¶ 2 ("The Defendant also discriminated against the Plaintiff . . ."); *id.* ¶ 23 ("Defendant Godding began sexually harassing the Plaintiff . . . ."); *id.* ¶ 17 (stating "Defendant Austin contributed to the sexually harassing environment at the DOC by harassing and twice sexually assaulting the Plaintiff," yet Ms. Hubert's deposition transcript, to which she cited, merely states that Ms. Hubert alleges Mr. Austin's harassment started in 1999 and after 2002 she had no further contact with him); *id.* ¶ 32 ("**When another officer called him, he answered that officer. That is retaliation!**" (emphasis in original)); *id.* ¶ 54 (stating, while citing solely to her own testimony, "Plaintiff learned that and experienced that when sexual

harassment complaints were file [*sic*] 'they have come back unsubstantiated'"); Smith Aff. ¶ 15, Pl.'s SMF, App'x C ("On information and belief, these 'sexual bets' were very commonplace at the DOC . . . .").

"Under Fed. R. Civ. P. 56(e), only admissible evidence may be used to resist a motion for summary judgment . . . ." *Rohman v. New York City Transit Auth. (NYCTA)*, 215 F.3d 208, 218 n.6 (2d Cir. 2000); *see, e.g.*, *McCloskey v. Union Carbide Corp.*, 815 F. Supp. 78, 81 (D. Conn. 1993) ("A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." (internal quotation marks omitted) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)); *Ventura v. Town of Manchester*, No. CIV. 3:06-cv-630 (EBB), 2008 WL 4080099, at *6 (D. Conn. Sept. 2, 2008) ("Legal conclusions offered by both lay and expert witnesses are inadmissible because it is not for a witness to instruct the court on the law." (citation omitted)); *A.D. v. Bd. of Educ. of City Sch. Dist. of City of New York*, 690 F. Supp. 2d 193, 216 (S.D.N.Y. 2010) ("[M]aterials submitted by a party in connection with a summary judgment motion must be 'made on personal knowledge.' This requirement is not satisfied by assertions made 'on information and belief' . . . ." (citation and internal quotation marks omitted)).

Given that Ms. Hubert's Statement of Material Facts and supporting affidavits contain inadmissible evidence, the Court declines to consider them. The Court also notes that, it is under no obligation to "review portions of the record in response to a motion, where the moving and opposition papers do not make specific reference to such portions of the record." L.R. 7(a)(3).

Accordingly, all properly supported factual allegations are undisputed.

### B.    Title VII

Ms. Hubert pursues three theories of liability under Title VII: (1) *quid pro quo* sexual harassment; (2) hostile working environment; and (3) retaliation. The Court will address each of Ms. Hubert's claims in turn.

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, claims of employment discrimination and retaliation are governed by the burden shifting analysis the Supreme Court established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citation omitted) (analyzing Title VII sex discrimination claims); *Grey v. City of Norwalk Bd. of Educ.*, 304 F. Supp. 2d 314, 321–22, 328–29 (D. Conn. 2004) (evaluating constructive discharge and hostile work environment claims under Title VII and CFEPA); *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177–78 (2d Cir. 1996) (in the context of a Title VII retaliation claim). Under this framework, Ms. Hubert bears the initial burden of establishing a *prima facie* case. *See Weinstock*, 224 F.3d at 42.

Once plaintiff has made a *prima facie* showing on all elements of each claim, "the burden then shifts to the employer to 'articulate a legitimate, clear, specific and nondiscriminatory reason' for its actions." *Grey*, 304 F. Supp. 2d at 322 (quoting *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995)); *see also Terry v. Ashcroft*, 336 F.3d 128, 137–38, 140–41 (2d Cir. 2003) (citations omitted) (in the Title VII race and gender discrimination and retaliation contexts). If the employer makes this showing, for the case to continue past summary judgment, the plaintiff then must "establish by a preponderance of the evidence that the employer's stated

reason was merely a pretext for discrimination." *See Grey*, 304 F. Supp. 2d at 322 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

As a preliminary matter, all Title VII claims brought against any of the individual defendants in their official capacities must be dismissed. Ms. Hubert argues Title VII permits suit against individually named defendants in their official capacities. It is well-settled that this is not the case. *See, e.g.*, *Littlejohn v. City of New York*, 795 F.3d 297, 313 (2d Cir. 2015) ("Title VII does not create liability in individual supervisors and co-workers who are not the plaintiffs' actual employers." (internal quotation marks omitted) (quoting *Raspardo v. Carlone*, 770 F.3d 97, 113 (2d Cir. 2014)); *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (internal quotations and marks) ("[I]ndividuals are not subject to liability under Title VII."); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995), *abrogated on other grounds* ("We now hold that individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII."). The Court therefore grants summary judgment as to Ms. Hubert's Title VII claims against Mr. Godding, Mr. Davis, Mr. Curry, Mr. Austin, and Mr. Callender. DOC therefore is the only remaining Defendant for purposes of the Court's Title VII analysis.

### 1. Exhaustion of Administrative Remedies

Defendants argue that Ms. Hubert failed to exhaust administrative remedies. Ms. Hubert does not dispute that she failed to exhaust administrative remedies with respect to some of her claims; instead, she argues that her claims are reasonably related to her administrative filings and, thus, she need not exhaust them before the CHRO or EEOC. The Court disagrees.

A plaintiff alleging employment discrimination under Title VII may not seek relief in a federal court until the plaintiff timely exhausts administrative remedies before the U.S. Equal

Employment Opportunity Commission ('EEOC'). *Hansen v. Jones Lang LaSalle Americas, Inc.*, 103 F. Supp. 3d 221, 222 (D. Conn. 2015). "Before bringing a Title VII suit in federal court, an individual must first present the claims forming the basis of such a suit . . . in a complaint to the EEOC or the equivalent state agency." *Littlejohn*, 795 F.3d at 322 (citation omitted and internal quotation marks omitted).

### a. The July 2010 Commission on Human Rights and Opportunities Complaint

In Ms. Hubert's July 2010 CHRO Complaint, she alleged that Ms. McLaurin subjected her to discrimination on account of her gender. The CHRO complaint alleged that Ms. McLaurin dropped Ms. Hubert from a lieutenant position as retaliation for Ms. Hubert making an earlier CHRO complaint against Ms. McLaurin. Ms. Hubert properly exhausted administrative remedies with respect to Ms. McLaurin's alleged retaliatory discrimination, and the DOC does not dispute this fact.

### b. The December 2011 Commission on Human Rights and Opportunities Complaint, as Amended on June 11, 2012

On April 23, 2012 Ms. Hubert filed a claim with the CHRO, which she amended on July 11, 2012. In that CHRO complaint, Ms. Hubert makes a number of allegations. Relevant to this matter, Ms. Hubert recounted the October 31, 2011 incident involving Mr. Mollin. Ms. Hubert also alleged that she was falsely disciplined because she allegedly hindered an investigation into her having sent a text message stating: "I was in a new place no signal I'm need you to bond me out of jail." When asked for the text as part of the DOC investigation, Ms. Hubert reported that the text was not on her cellular telephone because she had sent it from her son's telephone. The DOC does not dispute that Ms. Hubert has exhausted these claims.

Without exception, Ms. Hubert has raised additional claims against Mr. Godding, Mr. Davis, Mr. Curry, and Mr. Callender for the first time before this Court. These claims are accordingly barred unless "reasonably related" to the allegations in her EEOC charge.

### c.      Reasonably Related Test

The DOC argues they these additional claims are not reasonably related to the claims Ms. Hubert duly exhausted. Ms. Hubert argues that her non-exhausted claims were carried out in "precisely the same manner alleged in the EEOC charge." The Court disagrees.

But because failure of a Title VII plaintiff to exhaust administrative remedies is a claim-processing rule—as opposed to a jurisdictional rule—exhaustion of administrative remedies as a prerequisite to suit is subject to equitable defenses, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 385–86 (2d Cir. 2015) (citing *Bowles v. Russell*, 551 U.S. 205, 216 (2007) (Souter, J. dissenting); *see also Fernandez v. Chertoff*, 471 F.3d 45, 58 (2d Cir. 2006) ("Because [the] failure to exhaust [one's] administrative remedies is not a jurisdictional defect, it is subject to equitable defenses."), and waiver, *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).

Accordingly, a court may hear only those Title VII claims "that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993) (citation omitted), *superseded by statute on other grounds*. The Second Circuit has recognized several types of situations "where claims not alleged in an EEOC charge are sufficiently related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action," and has "loosely referred to these claims as 'reasonably related' to the allegations in the EEOC charge." *Butts*, 990 F.2d at

1402. The defense arises from a recognition that "EEOC charges [are] frequently are filled out by employees without the benefit of counsel . . . ." *Id.*

Subsequent conduct is reasonably related to conduct in an EEOC charge if: "[1] the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination; [2] it alleges retaliation for filing the EEOC charge; or [3] the plaintiff 'alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.'" *Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002) (quoting *Butts*, 990 F.2d at 1402–03.

Although Ms. Hubert's opposition brief is far from a model of clarity, she appears to make an argument that the second and third *Butts* exceptions to administrative exhaustion should apply. The Court disagrees.

### i.      Retaliation Exception

Ms. Hubert argues that she need not exhaust her unexhausted claims because many of the facts for which she has offered some degree of proof were, in fact, retaliation for Ms. Hubert rejecting the many sexual advances of her superiors. The Court disagrees.

Title VII makes it unlawful for an employer to discriminate against an employee because the employee has made a "charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Consistent with the text of the statute, the Second Circuit has instructed that, for an employee to avail herself of the second *Butts* exception, she must show a "specific linkage" between an EEOC charge and an act of retaliation. *Alfano*, 294 F.3d at 382; *accord Butts*, 990 F.2d at 1402 ("[W]e have relaxed the exhaustion requirement based on the close connection of the retaliatory act to both the initial discriminatory conduct and the filing of the charge itself." (citation omitted)).

Ms. Hubert has generally offered evidence as to two categories of additional, non-exhausted allegations relating to: (1) assault, propositions for sex, and sexually suggestive text messages, including sexually explicit photographs; (2) and false disciplinary charges.

As to the first category, these allegations are insufficiently related to Ms. Hubert's duly exhausted claims. In Ms. Hubert's July 2010 CHRO complaint, she lodged a complaint with CHRO because she had been demoted. Although Ms. Hubert generally alleges retaliatory conduct on the part of Mr. Davis, Mr. Austin, Mr. Curry, Mr. Godding, and Mr. Callender, Ms. Hubert has provided no evidence to show a "specific linkage" between her CHRO activity and these later acts of alleged discrimination. *See Alfano*, 294 F.3d at 382. As an example, in her opposition to the DOC's motion for summary judgment, Ms. Hubert argues that Mr. Callender "became harassing and retaliatory after she rebuffed his sexual advances." Pl.'s Opp'n Br. at 9. Elsewhere, she argues that Mr. Davis denied Ms. Hubert specific job assignments because she rebuffed his sexual advances. *Id.* at 15.[10] But Ms. Hubert has offered no evidence that these acts were somehow related to Mr. Hubert having "charge[ed], testified, assisted, or participated in any . . . investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a).

Ms. Hubert has also failed to provide any evidence probative of the connection between Ms. Hubert's CHRO activity and Mr. Callender issuing Ms. Hubert a late slip and what Ms. Hubert believes to be a poor evaluation. *See Abraham v. Potter*, 494 F. Supp. 2d 141, 151 (D. Conn. 2007) ("The scope of an EEOC investigation cannot reasonably be expected to encompass

---

[10] The Court notes that the Amended Complaint is similarly general as to how the conduct complained of relates back to Ms. Hubert having engaged in protected activity. *See, e.g.*, Am. Compl. ¶ 42 (stating that "Defendant [Callender], thereafter retaliated against the Plaintiff by discipliner her" for opposing his harassing conduct); *id.* ¶ 55 ("[T]he Plaintiff Sharone Hubert suffered numerous instances of retaliation from the Defendants."); *id.* ¶ 79 ("Plaintiff Sharone Hubert has been intentionally, discriminatorily, and arbitrarily passed over for promotion and advancement time and time again . . . .").

retaliation when [a plaintiff has] failed to put the agency on notice that [ ]he had engaged in the type of protected activity that is the predicate to a retaliation claim." (quoting *O'Hara v. Memorial Sloan–Kettering Cancer Center*, 27 Fed. App'x. 69, 70 (2d Cir. 2001)). Courts in the Second Circuit have made clear that the equitable exception to administrative exhaustion under Title VII does not permit a Title VII plaintiff to freely import non-exhausted claims into the case. *See, e.g.*, *Alfano*, 294 F.3d at 382 ("[The Plaintiff] did not allege that DOCS retaliated against her for filing an EEOC charge; her vague, conclusory accusations of 'retaliatory conduct' are insufficient to meet the *Butts* requirement of a specific linkage between filing an EEOC charge and an act of retaliation."); *Crawford v. Nat'l R.R. Passenger Corp.*, No. 3:15-cv-131 (JBA), 2015 WL 8023680, at *4 (D. Conn. Dec. 4, 2015) (casting doubt as to whether racist and threatening behavior by the plaintiff's co-worker was reasonably related to alleged retaliation amounting to an un-named supervisor's decision to hire the white relatives of one of the plaintiff's harassers over the plaintiff's daughter-in-law).

Here, the inquiry turns on whether Ms. Hubert has offered admissible evidence that demonstrates a "close connection of the retaliatory act to . . . the initial discriminatory conduct.'" *Butts*, 990 F.2d at 1402. She has not.

For the claims arising before the April 2012 charge but not included in it, the retaliation exception would not apply because the incidents arose before the April 2012 CHRO complaint. *See Zerilli v. New York City Transit Auth.*, 162 F.3d 1149, 1998 WL 642465, at *2 (2d Cir. 1998) ("[The plaintiff] could readily have included the incident in her EEOC charge. Her failure to do so means that she did not exhaust administrative remedies, and the claim is barred."); *Armstrong v. Potter*, No. 3:08-cv-1615 (HBF), 2010 WL 2584885, at *6 (D. Conn. June 21, 2010) ("When the alleged retaliation is not based on actions subsequent to the filing of the EEOC charge, the

relaxed exhaustion requirement . . . does not apply."). Even when presented with a second opportunity to properly exhaust the claim when she amended the complaint, Ms. Hubert chose not to do so. These allegations therefore are barred subject to the possibility that the same-manner exception may apply.

### ii.     Same Manner Exception

Ms. Hubert argues that the non-exhausted incidents are reasonably related to those that were properly exhausted because the latter were performed in precisely the same manner as the former. The Court disagrees.

In the same-manner inquiry, "the focus should be on the factual allegations made in the [CHRO] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (internal quotation marks omitted) (quoting *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 637 (9th Cir. 2002)). The central question is whether the plaintiff's complaint filed with the CHRO gave that agency "adequate notice to investigate discrimination on both bases." *Pleau v. Centrix, Inc.*, 501 F. Supp. 2d 321, 326 (D. Conn. 2007) (internal quotation marks and citation omitted).

Ms. Hubert has offered evidence of numerous specific incidents, that can be divided into two categories of discriminatory conduct: (1) Ms. Hubert's access to the restroom, and (2) sexual assault and sexual innuendo, propositions for sex, and sexually explicit text messages. The issue is whether either category of discriminatory conduct "can be fairly read to encompass the claims ultimately pleaded" or are sufficient to have "placed the employer on notice that such claims might be raised." *Mathirampuzha v. Potter*, 548 F.3d 70, 77 (2d Cir. 2008). The answer is no.

### (1)     The October 12, 2012 Incident

The April 2012 CHRO complaint, as amended, described the October 2012 incident with Mr. Mollin, which Ms. Hubert framed as a denial of medical treatment. The incidents involving Mr. Callender raise the issue of free access to restroom facilities. These incidents resemble one another to the extent that the three all involve Ms. Hubert's medical condition and the humiliation Ms. Hubert experienced as a result of them. But focusing on the factual allegations in the CHRO complaint regarding the Mollin incident, as this Court must, and contrasting that with the harassing conduct about which Ms. Hubert now alleges but has not exhausted, the resemblance fades. *See Deravin*, 335 F.3d at 201 ("In determining whether claims are reasonably related, the focus should be on the factual allegations made in the [EEOC] charge itself . . . .") (citation and internal quotation marks omitted). Ms. Hubert has offered no evidence to support the notion that the latter incidents "can reasonably be expected to grow out of the charge that was made," and the Court therefore cannot fairly construe them as falling within the scope of the CHRO investigation. *Fitzgerald v. Henderson*, 251 F.3d 345, 359–60 (2d Cir. 2001) (citation and internal quotation marks omitted).[11]

### (2)    Sexual Harassment

As to sexually explicit text messages, telephone calls, and sexual assault, in the 2012 CHRO complaint Ms. Hubert recounts the incident involving Ms. Williams. Ms. Hubert claimed to have been wrongly disciplined because she failed to provide the DOC with a text message sent to Ms. Williams when requested. This text message involved an exchange between two women of a nonsexual nature about a domestic incident of a non-sexual nature.

---

[11] Indeed, Ms. Hubert has provided the note from Ms. Hubert's medical provider that described her medical condition. May 23, 2014, Guerrera Ltr. at 1. The note is dated June 8, 2014. But the incident involving Mr. Callender took place after the note was issued. Ms. Hubert has offered no other evidence that Mr. Mollin or Mr. Callender knew about her medical condition.

In contrast, in this lawsuit, Ms. Hubert seeks to address various specific instances of inappropriate conduct of different degrees and frequencies with respect to Mr. Davis, Mr. Godding, Mr. Callender, and Mr. Curry involving text messages. But Ms. Hubert makes no reference to Mr. Davis, Mr. Austin, Mr. Godding, Mr. Callender or Mr. Curry in the 2014 CHRO.

While the exception to exhaustion for reasonably related claims is "based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [she] is suffering," *Littlejohn*, 795 F.3d at 322 (citation omitted), the CHRO investigation into the allegations Ms. Hubert made in the CHRO complaint could not reasonably have focused on the discrimination Ms. Hubert now claims that she suffered. *See Deravin*, 335 F.3d at 200–01 ("A claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." (citation and internal quotation marks omitted)). Ms. Hubert has offered no evidence to support a conclusion to the contrary.

Indeed, Ms. Hubert has testified that Mr. Godding and Mr. Callender regularly sent her sexually explicit text messages well before she brought a complaint before the CHRO in April 2012. The same is true of Mr. Davis and Mr. Austin allegedly sexually assaulting Ms. Hubert, while she was stationed at Harford CC the first time. "[Ms. Hubert] could readily have included the incident[s] in her [agency] charge. Her failure to do so means that she did not exhaust administrative remedies, and the claim is barred." *Zerilli*, 1998 WL 646465, at *2. Ms. Hubert made no allegations about sexual harassment and assault in the 2010 CHRO complaint, and

when faced with a second and third opportunity to properly exhaust these claims in the April 2012 charge, which she subsequently amended, she chose not to do so.[12]

The Second Circuit's decision in *Littlejohn* underscores this point. There, the plaintiff alleged that the defendant sexually harassed her in violation of Title VII, but the district court found that the plaintiff had failed to exhaust her administrative remedies. 795 F.3d at 321–22. In the agency intake questionnaire and charge of discrimination, the plaintiff claimed discrimination based on race and color and retaliation based on her complaints about such discrimination. *Id.* at 322. In neither of the forms did the plaintiff claim discrimination based on sex, "even though there is a box to indicate discrimination based on sex located directly next to those for race and color." *Id.* Nor did the plaintiff refer to the defendant nor any of his alleged acts of sexual harassment in the completed forms, which described why she allegedly suffered unlawful discrimination. *Id.* "Indeed, [the plaintiff's] Intake Questionnaire and Charge of Discrimination do not include any factual allegations whatsoever describing the alleged sexual harassment by [the defendant], even though the harassment allegedly began . . . . well before she completed these forms." *Id.* at 322–23.

The same is true here. Other than the fact that some of Ms. Hubert's non-exhausted claims involve a text message, the 2012 CHRO complaint contains no factual allegations whatsoever about sexually harassment. Courts in this Circuit recognize that "[a]n imperfect fit between the EEOC charge and complaint allegations is not fatal as long as Title VII's scheme of agency adjudication in the first instance is not thwarted." *Chinn v. City Univ. of New York Sch. of*

---

[12] Ms. Hubert has also indicated that, once she made a general allegation that her supervisors had sent her sexually explicit text messages, *see* Jan. 30, 2013, Hubert Ltr. at 1, she had representation by counsel, *see id.* (stating that she would provide the photographs to her attorney), assistance many administrative complainants do not have. *See Butts*, 990 F.2d at 1402 ("EEOC charges frequently are filled out by employees without the benefit of counsel . . . .").

*Law at Queens Coll.*, 963 F. Supp. 218, 222–23 (E.D.N.Y. 1997) (citing *Ong v. Cleland*, 642 F.2d 316, 319–20 (9th Cir. 1981)). But here, these claims "bear[] no factual or legal relation to the allegations in the [agency] charge and would not naturally be addressed in the course of an [agency] investigation into such allegations." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 84 (2d Cir. 2001). For this Court to view them otherwise would give too broad a meaning to the term "reasonably related" and ignore the narrowness of the exception, which requires later discrimination be carried out in "precisely" the same manner alleged in the agency complaint. *See Alfano*, 294 F.3d at 382. Moreover, "the values associated with exhaustion [would be] entirely lost because the [agency] would have [had not] the opportunity to investigate, if not the particular discriminatory incident, the method of discrimination manifested in prior charged incidents." *Butts*, 990 F.2d at 1403.

Ms. Hubert's argument that, she should be excused from exhausting her non-exhausted allegations about sexually explicit text messages because, at a CHRO mediation conference, DOC representatives "appeared to have been singularly interested in her sexual harassment related pictures," lacks merit.

At some point after the Affirmative Action Unit closed its investigation and when Ms. Hubert again met with a representative from the Affirmative Action Unit, Ms. Hubert had a CHRO hearing regarding Ms. Hubert's 2012 CHRO complaint. Ms. Hubert testified that at this hearing, "they were asking [her] for the pictures." Yet, as she has before on other occasions, Ms. Hubert "plead the fifth" and declined to answer, other than in the most general terms, questions about the photographs, instead explaining that she feared for physical safety. *See* Hubert Aff. ¶ 81 ("Although I didn't give names I reported Wardens, Captains and Officers had sent pictures of their penis exposed and erect to my cell phone and sexual text messages."). Ms. Hubert has

offered no evidence that is probative of whether CHRO had in its possession or had seen any of the photographs or had any outside knowledge of them other than that they existed and were allegedly sent from colleagues. Nor has Ms. Hubert attempted to shed light on why she would believe that investigation into the discrimination claim that she initiated would amount to self-incrimination such that the Fifth Amendment would apply. *Cf. Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them . . . .").

In short, Ms. Hubert's near complete refusal to provide material information at both agency levels has effectively forestalled a full and fair airing of her allegations of sexual harassment. This reticence, even if understandable given the sensitive nature of her claims, nevertheless, is at odds with her obligation to administratively exhaust her Title VII claims and the "concurrent obligation of good faith" participation in this administrative process before bringing suit. *Matos v. Hove*, 940 F. Supp. 67, 71 (S.D.N.Y. 1996) (listing Title VII cases where courts have dismissed complaints where a claimant fails to provide sufficient information that would enable the agency to investigate the claim); *cf. Miller v. Kempthorne*, 357 Fed. App'x 384, 385 n.1 (2d Cir. 2009) ("While an aggrieved employee may proceed directly to federal court on an ADEA claim, [the plaintiff] became obligated to exhaust his administrative remedies when he decided to commence proceedings with the EEOC.") (citing *Wrenn v. Sec'y, Dep't of Veterans Affairs*, 918 F.2d 1073, 1078 (2d Cir. 1990).

While Ms. Hubert has expressed having no faith in the Affirmative Action Unit's investigatory process, there is nothing in this record justifying the withholding of allegedly

critical information to an entirely independent administrative process, a requisite step to pursing these claims in federal court.

"The purpose of th[e] statutory prerequisite[] to bringing a civil action—and the well-established policy of the employment discrimination laws—is to provide an opportunity for the resolution of discrimination complaints by means of 'conciliation, conference, and persuasion.'" *Wrenn*, 918 F.2d at 1078 (citing 29 U.S.C. § 626(d); 42 U.S.C. § 2000e-5(b)). In enacting Title VII, Congress selected cooperation and voluntary compliance as the vehicle for achieving the goal of ensuring equal opportunity in employment. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974); *accord Mach Mining, LLC v. E.E.O.C.*, __ U.S. __, 135 S. Ct. 1645, 1651 (2015) ("In pursuing the goal of bringing employment discrimination to an end, Congress chose cooperation and voluntary compliance as its preferred means." (citation, internal question marks and brackets omitted)). The statutory mandate is not merely precatory. *Mach Mining*, 135 S. Ct. at 1651 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002)). Under the express terms of the statutory scheme, "[o]nly if the [appropriate agency] is 'unable to secure' an acceptable conciliation agreement—that is, only if its attempt to conciliate has failed—may a claim against the employer go forward." *Id.* (quoting § 2000e–5(f)(1)).

Absent a good-faith obligation to participate in the investigatory process, the requirement that a Title VII plaintiff exhaust administrative remedies becomes mere surplusage and "frustrate[s] the congressional policy favoring administrative resolution of complaints for no discernible reason." *Wrenn*, 918 F.2d at 1078.

As the Second Circuit has stated:

> Continued pursuit of such claims consumes judicial and other resources, resulting in a dead-weight social loss except for giving satisfaction to litigants who prefer court proceedings to

> administrative relief. However, litigation is not a sport in which the
> hunter may release a trapped quarry for the thrill of further chase.

*Id.* at 1078–79.

In light of the important public policy expressed in Title VII, this Court cannot reasonably say that Ms. Hubert has duly exhausted her allegations against Mr. Davis, Mr. Austin, Mr. Callender, Mr. Godding, or Mr. Curry or that these allegations reasonably relate to her exhausted claims. The allegations therefore are barred from further consideration.

Ms. Hubert's reliance on *Johnson v. Palma*, 931 F.2d 203 (2d Cir. 1991) is misplaced. The *Butts* exceptions to exhaustion focus on the nature of the factual allegation, but the test *Johnson* refers to, first articulated in *Glus v. G.C. Murphy Co.*, 562 F.2d 880 (3d Cir. 1977), asks whether a Title VII action in federal court may proceed against a particular party that was not joined in the agency action. *See Johnson*, 931 F.2d at 209–10 (quoting *Glus*, 562 F.2d at 888). The exception permits such a Title VII action where there is a "clear identity of interest" between the un-named defendant and the party named in the administrative charge. *Id.* at 209; *see, e.g.*, *Shider v. Commc'ns Workers of Am. Local 1105*, No. 04-2626-CV, 2005 WL 2650007, at *2 (2d Cir. Oct. 17, 2005) (summary order) (finding no common identity between a local and international union); *Coleman v. Bd. of Educ.*, 45 Fed. App'x 79, 80 (2d Cir. 2002) (summary order) (finding that the plaintiff could not challenge the lower court's dismissal of the teachers union as a defendant because the union was not a named party in the plaintiff's EEOC charge against the board of education); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1241 (2d Cir. 1995) (applying the test to assess whether the interests of two entities are identical); *Joseph v. United Techs. Corp.*, No. 14-cv-424 (AWT), 2015 WL 851895, at *4 (D. Conn. Feb. 26, 2015) (same); *Consolmagno v. Hosp. of St. Raphael*, No. 3:11-cv-109 (PCD), 2011 WL 4804774, at *6–7 (D. Conn. Oct. 11, 2011) (same).

As already discussed above, the DOC is the sole proper defendant in this case. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995), *abrogated on other grounds* ("[I]f a plaintiff's supervisor is the alleged harasser, an employer will be liable if the supervisor uses 'his actual or apparent authority to further the harassment . . . ." (quoting *Karibian v. Columbia Univ.*, 14 F.3d 773, 780 (2d Cir. 1994)). Ms. Hubert has identified no other actors that the Court has not already addressed, and the DOC is a named party herein. *Johnson* therefore is inapposite to the facts of this case.

Ms. Hubert argues that she should be excused from Title VII's exhaustion requirement under the equitable defense of futility—*i.e.*, her non-exhausted claims should be excused because the DOC has "taken a firm stand" against her, so her failure to exhaust administrative remedies may be excused on the ground that "exhaustion would be futile." *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997) (citing *Pavano v. Shalala*, 95 F.3d 147, 150 (2d Cir. 1996)); *see also Kirkendall v. Halliburton, Inc.,* 707 F.3d 173, 179 (2d Cir.2013) (noting that the exhaustion of administrative remedies requirement for ERISA claims "is not absolute" and may be excused when a plaintiff demonstrates that pursuing administrative remedies would be futile).

Although the availability of the futility defense in the context of EEOC Title VII exhaustion is an open question in the Second Circuit, *see Fowlkes*, 790 F.3d at 386 (recognizing that the Second Circuit has not had the occasion to consider this particular equitable defense but suggesting that the defense may have application), the Court need not, and does not address its applicability here, because the issue is not properly before the Court.

Ms. Hubert argues that DOC's administrative complaint process as it relates to sexual harassment is a "joke." Directive 2.2, however, contains no exhaustion requirement. *See* Administrative Directive 2.2 at 5 (stating: "Complaints may be made in the following ways: . . .

By filing a complaint with the Equal Employment Opportunities Commission (EEOC) or the Connecticut Commission on Humans Rights and Opportunities (CHRO) . . . ."). She does not make or advance by way of admissible evidence an argument that exhaustion of the CHRO process would have been futile, giving the discrimination she has suffered. *See, e.g.*, *Fowlkes*, 790 F.3d at 386 (recognizing that at the time the plaintiff, who alleged discrimination based on his transgender status, filed his complaint, the EEOC had developed a consistent body of decisions that did not recognize Title VII claims bases on an "acquired sex"). And given that she may proceed directly to the EEOC or CHRO under Directive 2.2, her futility argument is irrelevant to the question of whether she properly exhausted her claims at the CHRO level.

Having not exhausted any of her allegations against Mr. Davis, Mr. Austin, Mr. Curry, Mr. Godding, or Mr. Callender, and because no exception to the exhaustion requirement is applicable here, Ms. Hubert's allegations cannot form the basis of a viable Title VII claim against any of them. The sole allegation of harassment that has been timely exhausted is the October 31, 2011, incident involving Mr. Mollin.

### 2. Retaliation

As already stated, Title VII prohibits an employer from discriminating "against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a). "The objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).

To establish a *prima facie* case of retaliation under Title VII, the plaintiff bears the initial burden to submit evidence that the employee: (1) the employee engaged in an activity protected

by Title VII; (2) the employer was aware of this activity; (3) the employer took adverse action against the employee; and (4) a causal connection exists between the alleged adverse action and the protected activity. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citing *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)). *De minimis* is a plaintiff's burden at this *prima facie* stage. *Id.* (citing *Richardson v. New York State Dept. of Corr. Serv.*, 180 F.3d 426, 444 (2d Cir. 1999)).

If a plaintiff satisfies this initial burden, "a presumption of retaliation arises." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citation omitted). The burden of production then shifts to the defendant, who must "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (citation omitted). If so, "[t]he presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993). The employee must then show "that retaliation was a substantial reason for the adverse employment action." *Hicks*, 593 F.3d at 165 (citation omitted). A plaintiff can sustain this burden by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]." *Id.* at 164–65 (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

### a.    Ms. Hubert's *Prima Facie* Case

Ms. Hubert argues that, as part of a pattern of ongoing retaliation against Ms. Hubert for filing a CHRO complaint in August 2010, Mr. Mollin retaliated against her by refusing her medical treatment. The DOC argues that Ms. Hubert cannot prove retaliation for engaging in

protected activity because she has failed to raise a genuine issue of material fact as to the knowledge, adverse action, and causation elements of her *prima facie* case. The Court agrees.

### i. Knowledge

To satisfy the second element of the *prima facie* case, a plaintiff must show "a specific basis for imputing the [Title VII violation] to the employer." *Tucker v. Journal Register E.*, 520 F. Supp. 2d 374, 383–84 (D. Conn. 2007) (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d. Cir.2001)). "[A] jury . . . can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities . . . ." *Id.* at 384 (citing *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000)).

Ms. Hubert, however, has not offered any such evidence. She testified that Mr. Mollin knew about her protected activity because when she transferred to Cheshire CI "everybody knew about everything about [her]." Hubert Dep. at 38:14–15. Ms. Hubert explained that a colleague informed her that "everybody hated [Ms. Hubert] and that [she] should transfer out" and that officers were sitting around in the office talking about Ms. Hubert's CHRO complaint. *Id.* 39:4–15. But because Ms. Hubert lacks personal knowledge that Mr. Mollin knew of her protected activity, as alleged in the July 16, 2010, CHRO complaint, and because there is no testimony from the colleague who shared this information with her, by affidavit or otherwise, Ms. Hubert's testimony on this issue is not admissible evidence. *See* Hubert Aff. ¶ 26 ("I'm not sure if Lieutenant Mollins [*sic*] had a previous CHRO case, other supervisors knew."); *see also Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) ("'[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment,' and a 'district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence.'"

(quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009)); Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (citing Fed. R. Evid. 602 in stating that where a party relies on affidavits or deposition testimony to establish facts, the statements must be made on personal knowledge (internal quotation marks omitted)); *cf. Reilly v. City of W. Haven*, No. 3:02-cv-1346 (SRU), 2005 WL 1293969, at *4 (D. Conn. Mar. 31, 2005) ("[The plaintiff] points only to his own affidavit, his own deposition testimony, and a letter he wrote to a member of the City Council to buttress his claim that the Mayor's actions were retaliatory. The problem is that these documents only contain statements concerning [the plaintiff's] beliefs . . . that [the Mayor] acted to prevent him from obtaining a job . . . .").

Ms. Hubert's argument that Mr. Mollin possessed the requisite knowledge because the October 31, 2011, incident allegedly took place one day after "the CHRO matter was dismissed," is entirely unsupported by the evidence. Pl.'s Opp'n Br. at 24. Ms. Hubert has failed to provide, either through testimonial or documentary evidence, any clarity on which CHRO complaint, if any, was dismissed on October 30, 2011. The record contains two CHRO complaints, only one of which, the July 16, 2010 CHRO, precedes the Mollin incident. But a finding with respect to that CHRO complaint was not issued until August 28, 2013, 677 days before the Mollin incident. Moreover, Ms. Hubert testified that Mr. Mollin retaliated against her "because of who [she is]" and made no mention of the 2012 CHRO filing. Hubert Dep at 31:810.

And the DOC has offered evidence to the contrary. By way of an affidavit, Mr. Mollin testified that he had no knowledge of a CHRO complaint at the time of the incident. Mollin Aff. ¶ 4. He also testified that he asked Ms. Hubert to fill out an incident report, not because she had

engaged in protected activity, but because she had reported that she was going home sick. *Id.* Ms. Hubert has offered no evidence to rebut Mr. Mollin's testimony.

Ms. Hubert therefore has not raised a genuinely disputed issue of material fact as to whether Mr. Mollin knew of Ms. Hubert's July 2010 CHRO complaint.

Although Ms. Hubert's burden at the *prima facie* stage is *de minimis*, she still must meet even this burden, and she has failed to do so. Without some showing of knowledge supported by admissible evidence, there is no triable issue as to whether Mr. Mollin unlawfully related against Ms. Hubert for engaging in protected conduct.

Ms. Hubert has not raised any genuine issue of material fact as to a presumption of discriminatory retaliation. The Court therefore will grant summary judgment on this claim.

## C.    42 U.S.C. § 1985

Ms. Hubert argues that Mr. Austin, Mr. Davis, and Mr. Godding conspired to discriminate against Ms. Hubert due to her gender. The DOC argues that Ms. Hubert's claim under § 1985 is lacking essential elements. The Court agrees.

Section 1985(3) provides an action for damages caused by "two or more persons" who conspire to deprive someone of equal protection of the laws, so long as one person takes an act in furtherance of the object of the conspiracy. 42 U.S.C. § 1985(3). To allege a Section 1985(3) claim, a plaintiff must plead "(1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the law, or of equal privileges and immunities under the law; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right of privilege of a citizen of the United States." *Rini v. Zwirn*, 886 F. Supp. 270, 290 (E.D.N.Y. 1995) (citing *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 828–29 (1983)).

Ms. Hubert's claim under § 1985(3) is based on an alleged conspiracy among Mr. Austin, Mr. Davis, and Mr. Godding, betting on who would be the first to have sex with her. By way of affidavit, Ms. Hubert proffers the testimony of Eunice Smith, who worked for the DOC up until 2004. Smith Aff. ¶ 4, Pl.'s SMF, Ex. 18, ECF No. 130-15. Ms. Smith recounts being in the "chow hall" at Hartford CI when she overhead Mr. Austin making a bet with "the other officers" that he would be first to "sleep[ ] with Ms. Hubert." *Id.* ¶ 11. Ms. Smith testified that Mr. Austin and "the other officers" were laughing and joking about who would be the first to have sex with Ms. Hubert. *Id.* ¶ 14.

Other than Mr. Austin, Ms. Eunice fails to disclose the identities of the other officers. The record includes no other evidence from which a reasonable juror could infer that the officers sharing in Mr. Austin's vulgar conversation were Mr. Davis and Mr. Godding. Section 1985(3) expressly requires "two or more persons" to conspire, and Ms. Hubert has, therefore, failed to raise a genuine issue of material fact as to liability under § 1985.

The Court therefore will grant summary judgment on Ms. Hubert's § 1985 claim.

**D.      42 U.S.C. § 1986**

42 U.S.C. § 1986 provides that "every person" with the knowledge of the "wrongs conspired to be done" and "having power to prevent or aid in preventing the commission of" wrongs proscribed by § 1985 and neglects or refuses to do so, "shall be liable to the party injured . . . for all damages caused by such wrongful act . . . ." Relief under 42 U.S.C. § 1986 flows from a viable claim under § 1985. *Brown v. City of Oneonta, New York*, 221 F.3d 329, 341 (2d Cir. 2000) (affirming dismissal plaintiff's § 1986 claim because such a claim "must be predicated on a valid § 1985 claim"). Because the Court granted summary judgment of Ms. Hubert's § 1985 in favor of Mr. Austin, Mr. Davis, and Mr. Godding, "no § 1986 claim will lie where there is no

valid § 1985 claim." *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 419 (2d Cir. 1999) (citing *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994)).

The Court therefore will grant summary judgment of Ms. Hubert's § 1986 claim.

### E.    42 U.S.C. § 1988

Section 1988 allows the Court, "in its discretion, [to] allow the prevailing party . . . a reasonable attorney's fee as part of the costs" of bringing a lawsuit under Section 1985 and 1986. 42 U.S.C. § 1988(b); *see also Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (noting that Congress enacted § 1988 in response to the "American Rule" under which each party in a lawsuit ordinarily shall bear its own fees). An award under § 1988 requires success on the merits. *See Fox v. Vice*, 563 U.S. 826, 833 (2011) ("When a plaintiff succeeds in remedying a civil rights violation, we have stated, he serves as a private attorney general, vindicating a policy that Congress considered of the highest priority." (internal quotation marks omitted) (quoting *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968) (*per curiam*))); *Farrar v. Hobby*, 506 U.S. 103, 109 (1992) ("[P]laintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." (internal quotations marks omitted) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983)).

Because of the analysis above, Ms. Hubert has no other viable claims in this lawsuit. A claim for relief under § 1988, however, cannot stand without a predicate civil rights violation. *See Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372, 376 (1979) (providing that the Reconstruction-era civil rights statues "create[] no substantive rights [themselves] but . . . provid[e] a civil cause of action when some otherwise defined federal right-to equal protection of the laws or equal privileges and immunities under the laws-is breached"); *Williams v. State of*

*Connecticut Dep't of Corr.*, No. 3:16-CV-01612 (VAB), 2017 WL 2838081, at *6 (D. Conn. June 30, 2017) (dismissing any stand-alone claims under § 1988).

The Court therefore will grant summary judgment against Ms. Hubert's § 1988 claim.

## IV. CONCLUSION

For the reasons discussed above, the motion for summary judgment is **GRANTED**. The motion to dismiss is **DENIED** as moot, the motion for reconsideration is **DENIED** as moot, and the motion for consolidation is **DENIED** as moot.

The Clerk of the Court is instructed to enter judgment in favor of the State of Connecticut Department of Correction, Kyle Godding, Michael Davis, Kevin Curry, Derrick Austin, and Cicero Callender and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of March, 2018.

    /s/ Victor A. Bolden

VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE